# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

John Doe, pro se

Washington D.C.

      Plaintiff

v.

National Football League

345 Park Ave.

New York, NY 10154

      Defendant

Case: 1:25−cv−03115 JURY DEMAND
Assigned To : Unassigned
Assign. Date : 9/10/2025
Description: Pro Se Gen. Civ. (F−DECK)

      Demand For Jury Trial

---

**"Not everything that is faced can be changed,**

**but nothing can be changed until it is faced."**

      **James Baldwin.**


**"If you are neutral in situations of injustice,**

**You have chosen the side of the oppressor"**

      **Desmond Tutu.**

RECEIVED

SEP 1 0 2025



Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

"As long as there is racial privilege, racism will never end."

Wayne Gerard Trotman.


"White male supremacy is a deep current in American history

and culture. To extirpate it is not gonna be easy"

Noam Chomsky.


"White supremacy is more than the idea that whites are

superior to people of color; it is the deeper premise that supports this

idea-- the definition of whites as the norm or standard for human, and

people of color as a deviation from the norm"

Robin DiAngelo.


## COMPLAINT AT LAW


Notice is given that this action is filed in the United States District Court of the

District of Columbia named above on September 10 2025, by John Doe

(hereinafter individually and collectively referred to as (Plaintiff) acting as

authorized representatives for and on behalf of John Doe Plaintiff, against the

National Football League.  The object of this action is to request that this

Honorable Court award remedies, damages, as well as punitive damages against

the National Football League (NFL) for its long- standing racial prejudicial system

and systemic biases against African-Americans as it pertains to disproportionate hirings of positions of leadership on NFL teams. The National Football Leagues underlying "good ole boy" policy of anti-blackness and institutional racism against qualified African-American coaches and African American athletes that play the position of "Quarterback" has caused the Plaintiff trauma—in particular Racial Trauma. The Plaintiff is an African-American male who has experienced racism by White-Americans. The Plaintiff began watching and enjoying NFL games as an adolescent. The National Football League's institutional racism toward African-American men in promotion of their underlying anti-black policy against hiring African-Americans in leadership positions in particularly Head Coaches and Quarterbacks on NFL teams have caused the Plaintiff extreme emotional distress, health complications, and racial trauma which will be further explained within this Complaint-at- law.

## JURISICTION AND VENUE

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions.

## PARTIES

1) At all relevant times, the Plaintiff is an United States citizen born in America and is currently a resident of The District of Columbia.

2) The Plaintiff brings this private-right- of action under DC Code 2-1403.16 and D.C. Code 28-3905.

3) Plaintiff is informed and believe and thereon allege that, at all times herein each of the defendants sued herein was the agent or employee of each of the remaining defendants and at all times was acting within the purpose and scope of such agency or employment.

4) Plaintiff is ignorant of the true names and capacities of defendants sued herein as DOES I through 114 inclusive, and therefore sues these defendants by such fictitious names.

5) Plaintiff will amend this complaint to allege their true names and capacities when ascertained.

6) Defendant National Football League is an organization/business comprised of 32 professional football teams operating throughout the United States. The organization/business advertises, sells goods and provide entertainment that effect District of Columbia consumers and residents.

7) paragraphs 1-6 are incorporated by reference.

**Preliminary Statement**

8) By Law and precedent and in accordance with the Supreme Court of the United States, pro se Pleadings MAY NOT be held to the same standard as a lawyer's and/or attorney's; and whose motions, pleadings and all papers may ONLY be judged by their function and never their form.  See: Haines v. Kerner; Platsky v. CIA; Anastasoff v. United States; Litigants are to be held to less stringent pleading standards;

*Also See:* Haines v. Kerner, 404 U.S. 519-421; In re Haines: pro se litigants are held to less stringent pleading standards than admitted or licensed bar attorneys. Regardless of the deficiencies in their pleadings, pro se litigants are entitled to the opportunity to submit evidence in support of their claims. *See also:* Platsky v. C.I.A., 953 f.2d. 25; In re Platsky: court errs if court dismisses the pro se litigant without instruction of how pleadings are deficient and how to repair pleadings.

Also *See :* Anastasoff v. United States, 223 F.3d 898 (8th Cir. 2000); In re Anastasoff: litigants' constitutional (guaranteed) rights are violated when courts depart from precedent where parties are similarly situated.

9) Now Comes Plaintiff, John Doe, Pro se, hereby brings this Complaint.  The Civil remedies that the Plaintiff seeks is Compensatory Damages, Statutory Damages, General Damages, Injunctive Relief, Attorney Fees and Punitive Damages against the National Football League for violations of Federal and State Laws including but

not limited to: D.C. Code 28-4508, D.C. Human Rights Act, Title VII of the Civil Rights Act 1964, District of Columbia Consumer Protection Act, Sherman Anti-Trust Act of 1890, The Clayton Act, DC Code 22-3704 (Intentional Emotional Distress resulting in trauma), Gross Negligence.

10) The Plaintiff contends that he is entitled to such an award of damages based on the Defendants' individual and collective wrongful acts of misconduct that relate directly and indirectly to violations of District of Columbia Laws and Federal Laws created by Congress.

11) Plaintiff asserts in this court of record and for causes of action against the above-named Defendants, in this matter before the Bench, it is placidly clear that several deceptive actions, unfair business practices and violations of Federal and State Laws both civil and criminal have occurred which has aggrieved the Plaintiff, caused the Plaintiff to suffer from Post Traumatic Stress and has caused Race-Based Intentional Emotional Distress.

12) The Actions of the Defendants exemplifies the very definition of misconduct and malfeasance.

# BACKGROUND

## (PAST AND RECENT HISTORY OF RACIAL BIAS, RACE BASED DISCRIMANTION, DISPROPORTIONATE DISCIPLINARY POLICY AND COLLUSION TO

**PREVENT THE HIRING OF AFRICAN AMERICANS IN POSITIONS OF LEADERSHIP ON NFL TEAMS BY THE NATIONAL FOOTBALL LEAGUE)**

13) Paragraph 1-12 are incorporated by reference.

14) From 1934 through 1946, the National Football League had in place an unofficial but absolute racially- based discriminatory ban on Black Players. The ban is alleged to have been put in place primarily by George Preston Marshall who was the owner of Washington Redskins currently named the Washington Commanders.

15) In 1946, the alleged unofficial ban on Black players was lifted and Black players re-integrated the NFL.

16)  The National Football League as we know it today, originated as the American Professional Football Association in 1920 and was renamed the National Football League in 1922.

17) From its creation which spans more than a century, the National Football League has never had a majority African American Owner.

18) It is estimated that the National Football League is currently worth approximately 280 billion dollars and African-Americans make-up approximately 70% of players employed by NFL teams.

19) Over twenty-five (25) seasons from 2000 through 2024, 31 of 173 new NFL Coaches are African-American. In that same span, eight of the 19 head coaches fired after their first full season are African-American.

20) In 2025, out of six (6) NFL head coach hirings only one (1) is African-American (Aaaron Glenn hired by the New York Jets) despite the so called "Rooney Rule".

## DISCRIMINATION AT THE POSITION OF QUARTERBACK

21) Paragraphs 1-20 are incorporated by reference.

22) Going into the season of 2025, NFL teams have a total of 51 players on the active roster at the quarterback position that are white men (the total is much higher if you include "practice squad quarterbacks) compared to 30 African-American male quarterbacks. These totals include both starters and back-ups with a few on injured reserve. Fact based evidence supports that there are thirty (30) African American Quarterbacks currently employed on active rosters by NFL teams which include:

| | | |
|---|---|---|
| 1) Jayden Daniels | 8) Patrick Mahomes | 15) Michael Penix |
| 2) Dak Prescott | 9) Lamar Jackson | 16) Caleb Williams |
| 3) Spencer Rattler | 10) Kyler Murray | 17) Cam Ward |
| 4) Jalen Hurts | 11) C.J. Stroud | 18) Bryce Young |
| 5) Russel Wilson | 12) Anthony Richardson | 19) Shadeur Sanders |
| 6) Deshaun Watson | 13) Jalen Milroe | 20) Jacoby Brisset |

| | | |
|---|---|---|
| 7)  Geno Smith | 14) Jameis Winston | 21) Justin Fields |
| 22) Tyler Huntley | 26) Trey Lance | 30) Josh Johnson |
| 23) Tyrod Taylor | 27) Teddy Bridgewater | |
| 24) Jordan Love | 28) Malik Willis | |
| 25) Joshua Dobbs | 29) Emory Jones | |

Every African-American Quarterback listed is either a current starting Quarterback entering the 2025 NFL season, a Heisman Trophy Winner at the collegiate level, at one time was considered a Heisman Trophy potential candidate at the collegiate level or has competed in live NFL games displaying their ability to compete and win games in the NFL.  Of the sixteen African American Quarterbacks listed on NFL active rosters as a "starting" Quarterback, only nine have signed lucrative contracts that are in line with their White Male counterparts. The statistics and general perception indicate that in order for an African-American to be hired by an NFL Team for the position of quarterback (even as a back-up), they must show exceptional ability to compete at a higher level than their white male counterparts.  Because the NFL has consistently colluded to restrict equal pay to African American Players and to support White Male Dominance throughout its sports organization by hindering fair competition and discriminating against African Americans at the quarterback position, many of the African-American "back-up" quarterbacks have not been given fair opportunity to compete for "starting" quarterback positions nor are they provided time to develop into "pro style" NFL Quarterbacks as opposed to

their white male counterparts which violates and continues to violate Anti-Trust Laws, Human Rights Laws and Consumer Protection Laws. The facts support that many African-American" back-up" quarterbacks on the list or experienced African-American quarterbacks that have been fired and cannot get re-hired by an NFL team have shown a better ability to compete at the quarterback position than current white male quarterbacks both starting and being designated as back-ups in NFL games. For example:

A) Daniel Jones is a white male starting quarterback in the NFL. Last season 2024, he started for New York Giants. His 2024 record was 2 wins and 8 losses while throwing eight (8) touchdowns and seven (7) interceptions before being benched during week ten (10). In 2024, the Giants offense ranked last in scoring. Before being released by the Giants, Daniel Jones was awarded a 160-million-dollar contract extension in 2023. His career pass to interception ratio is:

2019- 24 touchdowns against 12 interceptions

2020 11 touchdowns against 10 interceptions

2021 10 touchdowns against 7 interceptions

2022  15 touchdowns against 5 interceptions

2023  2 touchdowns against 7 interceptions

2024 8 touchdowns against 7 interceptions


After being released by the New Yor Giants, Daniel Jones is listed as the starting

quarterback for the Indianapolis Colts because according to the Colt's head coach "he provides a better chance at winning". Daniel Jones supplants Anthony Richardson who is an African-American Quarterback drafted #4 overall in 2023 to be the Colts starting Quarterback. Richardson sustained a concussion in his 2nd game as a starting Quarterback and a season-ending shoulder injury while playing in week four of the 2023 season.   He did not play in weeks 5 and 6 of the 2024 season due to an oblique injury. He was benched in week 9 and 10 by his Head Coach and sustained another injury in week 17 and 18 of the 2024 season. The Plaintiff makes the argument that Richardson has not been provided the same opportunities to develop and gain experience as his white male counterparts. The head coach makes a ridiculous explanation that he wants Richardson to develop as a Quarterback by learning from Daniel Jones. A reasonable minded person would assume that Richardson cannot develop or learn from a Quarterback whose only NFL accomplishment is being awarded a lucrative NFL contract. The perception is that the Coach's decision to replace Richardson with Daniel Jones has racial undertones.

B) Andy Dalton is an NFL veteran Quarterback originally drafted by the Cincinnati Bengals. He served as the Bengals starting Quarterback for nine (9) seasons in which he never won a playoff game. Since his departure from the Bengals, he has been hired by the Dallas Cowboys, Chicago Bears, New Orleans Saints and now serves as the "back-up" Quarterback for the Carolina Panthers football team. Andy Dalton's career earnings in the NFL are estimated to be

approximately 114 million dollars.

C) Mitch Trubisky is an NFL veteran Quarterback originally drafted by the Chicago Bears in 2017. In four (4) years as the Bears starting Quarterback, he won one (1) playoff game. Since leaving the Chicago Bears organization, he has been hired as a "back-up" quarterback by the Pittsburgh Steelers and Buffalo Bills. It is estimated that Trubisky career earning while being employed as an NFL Quarterback is approximately 48 million dollars.

D) Ryan Tannehill is a free-agent NFL veteran Quarterback originally drafted by the Miami Dolphins in 2012. From 2012-2018, Tannehill never won a playoff game as the Dolphins starting quarterback. Since leaving the Dolphins in 2019, he was hired to be the starting quarterback for the Tennessee Titans. In five (5) seasons as the starting quarterback for the Titans, Tannehill won two (2) playoff games.  It is estimated that while being employed as an NFL Quarterback, Tannehill earnings are estimated to be 195 million dollars.

E) Derek Carr is a recently retired NFL Quarterback. He was originally Drafted by the Oakland Raiders in 2014. From 2014 to 2024 while being employed by the Raiders and then the Saints, Carr never won a playoff game. It is estimated that while being employed as a starting NFL Quarterback, Carr has earned an estimated 205 million dollars.

F) Kurt Cousins is a white male "back-up" Quarterback for the Atlanta Falcons. He was originally drafted by the Washington Redskins in 2012. After leaving the Redskins, he has been employed by the Minnesota Vikings and the Atlanta Falcons. Cousins has won one (1) playoff game in his 12-year career. It is estimated that Kurt Cousins total career earnings while being employed in the NFL will be approximately 400 million dollars.

23) The previously mentioned examples are one of many examples where white male quarterbacks are given opportunity after opportunity to maintain employment on NFL teams even after their on-field production indicates a lack of the ability to effectively compete. African-American quarterbacks are not given fair opportunities to develop, earn lucrative contracts, or compete for starting quarterback positions on NFL teams. What this amount to is an unjustifiable transfer of wealth to white males at the Quarterback position by the National Football League while excluding African-American male quarterbacks from the wealth-transfer opportunities. Just because the NFL has awarded a handful of lucrative contracts to African American Quarterbacks does not justify the systemic-racism that is actually taking place. Factual evidence shows that the few lucrative contracts that are awarded to African American Quarterbacks are "well earned"; meaning their teams compete for championships. The NFL sets the bar high for African-American Quarterbacks who start on Sundays and for those who are "back-ups".

**African-American "back-up" Quarterbacks do not receive equal pay for equal work:**

24) Paragraphs 1-23 are incorporated by reference.

25) Tyson Bagent is a white male "back-up" Quarterback for the Chicago Bears. He was not drafted by an NFL team during the 2023 draft process. He signed with the Chicago Bears as an undrafted free-agent in year 2023. His career stats are as follows:

2023- 94 completions   143 attempts   859 yards 3 touchdowns 6 interceptions

2024- 2 completions     2 attempts       11 yards

In 2023, Tyson Bagent signed a three-year 2.72-million-dollar contract with the Chicago Bears as an undrafted back-up Quarterback from a division II school which means that it was impossible for him to be in the conversation as a Heisman Trophy candidate. In 2025 the Chicago Bears awarded Tyson Bagent a ten (10) million-dollar contract extension while he is still designated as a "back-up" quarterback.  The significance of Tyson Bagent's contract is that it is significantly more lucrative than the majority of African American "back-up" quarterbacks previously listed going into the 2025 NFL season with the only exception being Tyrod Taylor.

26) Jarrett Stidham is a white male "back-up" Quarterback for the Denver Broncos. He was drafted by the New England Patriots in 2019. His career stats

are as follows:

2019- Zero touchdowns, 14 yards passing, 1 Interception

2020- two touchdowns, 245 yards passing, 3 interceptions

2022- four touchdowns, 656 yards passing, 3 interceptions

2023-two touchdowns, 496 yards passing, 1 interception

After signing a 10-million-dollar contract with the Broncos in 2023, he was awarded a 12-million-dollar contract extension in March 2025. Both contracts are significantly higher than African-American "back-up" Quarterbacks currently employed by NFL teams.


27) Mason Rudolph is a white male "back-up" Quarterback for the Pittsburgh Steelers. He was drafted by the Steelers in the 3rd round of the 2018 NFL Draft. His career stats are as follows:

2019- thirteen touchdowns, 1765 passing yards 9 interceptions

2020 -two touchdowns, 324 yards passing, 1 interception

2021- one touchdown, 277 yards passing, 1 interception

2023 -three touchdowns, 719 yards passing, 0 interceptions

2024-Nine touchdowns, 1530 yards passing, 9 interceptions


Rudolph signed an 8-million-dollar contract with the Pittsburgh Steelers in March 2025. It is estimated that after Rudolph has thrown a total of ten touchdowns and twenty interceptions in his five-year career, his career earnings are approximate thirteen (13) million dollars.

28) Doug Williams was drafted by the Tampa Bay Buccaneers as the 17th overall pick in the 1978 NFL Draft. He made history by becoming the first African-American quarterback to be selected in the first round of an NFL draft.  During his tenure with the Buccaneers, Williams was paid 120,000 a year. The pay Williams received was the lowest salary for a starting Quarterback in the league and less than the salary of twelve (12) back-up quarterbacks. In 1979, Williams led the Buccaneers to their first ever NFC Championship game. After the 1982 season, Williams asked Tampa Bay owner Hugh Culverhouse for a raise in salary that was more in-line with White Male starting NFL quarterbacks; Culverhouse refused. Feeling that Culverhouse was not paying him what an NFL starter should earn, Williams refused to play in the NFL 1983 season. During the 1983 season without Williams at the Quarterback position, the Tampa Bay Buccaneers won two (2) games and lost fourteen (14) games and did not make the playoffs again until 1997 (14 years later).

In 1986, Williams was hired by the Washington Redskins as a "back-up" Quarterback. In 1988, Williams was designated as the starting Quarterback for the Redskins in Superbowl XXII where he became the first African-American Quarterback to play in and win a Superbowl Title. He was also named as the MOST VALUABLE PLAYER in Superbowl XXII making him the first African-American quarterback to win the Superbowl and be named MOST VALUABLE PLAYER. He broke the NFL's season passing yards record set by the Great Joe

Montana in 1985. After winning the Superbowl, the following season the Redskins designated Doug Willimas as the "back-up" Quarterback to white male Mark Rypien. The Redskins fired Doug Williams in 1990 and it is alleged that he received "scant attention from other NFL teams after being fired from the Redskins which he has attributed to racism by NFL teams. Here is an African-American male Quarterback who competed at a high-level in championship games and ultimately won a Superbowl and was without a job as a starting or "back-up" Quarterback position on any NFL team two (2) years after being named Most Valuable Player.

29) Colin Kaepernick is an African-American male who at one time was a "back-up" Quarterback for the San Fransico 49ers. He was allowed the opportunity to become the starting Quarterback when the designated starter was injured during the 2012 season. After Kaepernick took over as the starting quarterback, he led his team to Superbowl to their first Superbowl appearance since 1994. During the 2013 season, his first full season as the starting Quarterback for the 49ers, he led his team to the NFC Championship. In the 2016 NFL season, Kaepernick sat during the playing of the United States National Anthem before the game began rather than stand. He sat in protest against racial injustice, police brutality, and oppression of people in underserved communities throughout the country. Throughout the 2016 season, Kaepernick took a knee (he kneeled) during the singing of the National Anthem to remain is protest. In 2017, Kaepernick was out of a job as an NFL Quarterback and he has never been

given an opportunity to be a part of any NFL team as a Quarterback since that time. In 2017, he filed a grievance against the NFL and its owners accusing them of collusion in keeping him locked out of NFL employment. He reached a confidential settlement with the NFL in 2019. Kaepernick has still expressed a willingness and readiness to contribute to an NFL team but he remains locked-out of employment today. When reviewing previous statements that the Plaintiff has inserted in this action involving White Male Quarterbacks who has never won a playoff game and "back-up" Quarterbacks who have never shown an ability to lead a team or be competitive as an NFL Quarterback, there is absolutely no reason that this Honorable Court should not come to the conclusion that Kaepernick has proven the ability to contribute to an NFL Team competitiveness in pursuit of a Championship.

Kaepernick made the decision to kneel as oppose to standing up during the singing of the National Anthem. Instead of the NFL, which is comprised of a majority of African-American players supporting his Human Rights and Constitutional rights, the NFL punished and retaliated against.

The National Football league is uniquely situated as its workplace environment is on display for the entire world to see. The Plaintiff was mortified and traumatized while watching the NFL retaliate against Kaepernick for bringing attention to police brutality and racial injustices against people of color which is a "Matter of Public Concern." Kaepernick's decision to kneel during the singing

of the National Anthem did not impede his ability to perform his job (see Pickering v. Board of Education (1968). In fact, there is absolutely no difference in what Colin Kaepernick did by peacefully protesting racial injustice and police brutality against people of color then what the Reverend Dr. Martin Luther King did when he held peaceful demonstrations to bring awareness to the exact same issues. Just as Reverend King was assassinated for daring to dream of an America where people are not targeted and discriminated against because of the color of their skin, Kaepernick has been targeted and his career has been assassinated by the National Football League. There will be more to this issue later in this Complaint.

30) It is estimated that in 2024, the National Football League generated approximately twenty-three (23) billion dollars in total revenue and distributed thirteen (13) billion dollars of revenue to NFL teams. The NFL has colluded to implement a racist and unjust system in order to transfer a significant portion of wealth to the quarterback position that is discriminately occupied by white men who more often than not fail to meet the standard and expectations of competition in a sports environment while denying African-American males those opportunities. The significance of this disproportionate, unlawful and unjust transfer of wealth from the NFL is that it creates a means where White men can create opportunities for their future generations at the expense of African-American athletes that make up the majority of NFL Players.

## THE 2025 LIST OF NFL PRACTICE SQUAD QUARTERBACK POSITIONS

31) paragraphs 1-30 are incorporated by reference.

32) Green Bay Packers- Clayton Tune (White Male)

   Tampa Buccaneers- Conor Bazelak (White Male)

   New Orleans Saints- Hunter Dekkers and Jake Haener (White Males)

   Carolina Panthers- Hendon Hooker (Black Male)

   Atlanta Falcons- Easton Stick (White Male)

   Philadelphia Eagles- Kyle McCord (White Male)

   Clevland Browns- Bailey Zappe (White Male)

   Cincinnati Bengals- Brett Rypien (White Male)

   Minnesota Vikings- Max Brosner (White Male)

   Chicago Bears-Austin Reed (White Male)

   New England Patriots-Tommy Devito (White Male)

   San Fransico 49ers – Adrian Martinez (Latino)

   Washington Commanders-Sam Hartman (White Male)

   Las Vegas Raiders-Cam Miller (White Male)

   Buffalo Bills-Shane Buechele (White Male)

   Dallas Cowboys-Will Grier (White Male)

   Arizona Cardinals- Kedon Slovis (White Male)

   Miami Dolphins-Bret Gabbert (White Male)

   Baltimore Ravens-Tyler Huntley (Black Male)

Kansas City Chiefs- Chris Oladokun (Black Male)

Los Angeles Rams-Dresser Winn (White Male)

Denver Broncos-Sam Ehlinger (White Male)

Indianapolis Colts- does not list a Practice Squad quarterback as of this filing

Jacksonville Jaguars- Seth Henigan (White Male)

Tennessee Titans-Trevor Siemian (White Male)

Detroit Lions- C.J. Beathard (White Male)

Seattle Seahawks-does not list a Practice Squad quarterback as of this filing

Los Angeles Chargers-DJ Uiagalelei (Black Male)

Houston Texans- does not list a Practice Squad quarterback

New York Jets-Brady Cook (White Male)

New York Giants-does not list a Practice Squad quarterback

Pittsburgh Steelers- Clayton Tune (White Male)

33) The above lists show that of the thirty-two (32) NFL teams going into the NFL 2025 season only twenty-eight teams (28) actually hired a Practice Squad Quarterback and of the twenty-eight teams that hired a Practice Squad Quarterback, twenty-three (25) are white males.  The National Football League Practice Squad is used to "develop" NFL players. The NFL's 2025 list of Practice Squad players is consistent with the History of the NFL's systemic-racism towards African-American athletes that play the position of Quarterback. The NFL chooses to disproportionately develop white males to play the position of Quarterback (leadership position) while not allowing those opportunities to

African-American males at an alarming rate.

34) The estimated Practice Squad Quarterback Salary ranges from 234,000 per year to 450,000 per year on average. For most athletes that have just graduated from college, this range of salary can be a life-changing experience.

## DISCRIMINATION HEAD COACH POSITION

35) paragraphs 1-34 are incorporated by reference.

36) Of the thirty-two (32) NFL Teams entering the 2025 season, only five (5) Teams are represented by an African American Head Coach.

37) In the history of the National Football League which spans over a century, eleven (11) NFL Teams have never hired an African American Head Coach.

38) Mike Vrabel was employed by the New England Patriots to play the position of linebacker. After he retired from the NFL, he became a football coach. In 2018, the Tennessee Titans hired Vrabel as their Head Coach. His combined Head Coaching record in a span of six (6) years is fifty-six (56) wins and forty-eight (48) losses. In his first year as a head coach in 2018 his team won nine (9) games with seven (7) losses. Mike Vrabel who has almost as many losses as victories was

hired to replace Jerod Mayo as the next Head Coach of the New England Patriots.

39) Jerod Mayo who is an African-American male also played linebacker for the New England Patriots. Like Vrabel, he retired and became a football coach. In 2024, Mayo was hired to be the Head Coach of the New England Patriots. After only one (1) season as a Head Coach where his team had four (4) wins and thirteen (13) losses, he was fired. The significance of Mayo being fired by the New England Patriots is that the organization has never fired a Head Coach after a one-year performance. Bill Belichick who many consider as one of the greatest Head Coaches in the history of the NFL was hired by the New England Patriots in year 2000 and his record after his first season coaching for the New England Patriots was five (5) wins and eleven (11) losses. The only difference between Jerod Mayo and Bill Belichick when you compare their first-year performance with the New England Patriots is that Mayo was coaching while being Black. Mayo who was fired in January 2025 is currently unemployed.

40) Brian Daboll is a white male that was hired as the Head Coach for the New York Giants in 2022. He had never held a Head Coaching job in the National Football League prior to his employment with the Giants. From 2022-2024, Daboll has an unimpressive win/loss record of eighteen (18) wins, thirty-two (32) losses and one (1) draw. He is still employed as the Giants Head Coach entering the 2025 NFL season. The significance of Mr. Daboll employment with the New York Giants is that it is currently the subject of a Federal Lawsuit filed by Brian

Flores in the United States District Court Southern District of New York (see case # 1-22-cv-00871). The Complaint alleges that the New York Giants violated the NFL's "Rooney Rule" which mandates NFL teams to give fair opportunity to African American Coaches to become employed as NFL Head Coaches. On its surface, it appears that the allegations are likely to succeed on the merits. The fact that the NFL felt a need to implement such a rule speaks volumes to the systemic racism that is embedded within the organization. However, this rule is a joke as it appears that NFL Owners uses it to their advantage to "cover their butts" while Roger Goodell and the National Football League "look the other way". The Honorable Judge Valerie Caproni of the United States Court Southern District of New York stated in a ruling in the Flores action "their descriptions of experiencing racial bias were incredibly troubling" and the coaches claims "Shined an unflattering spotlight on the employment practices of the National Football League teams".

41) Dennis Allen is a white male who was a defensive coordinator for the Denver Broncos prior to being hired as a Head Coach for the Oakland Raiders in 2012. From 2012-2014, he had an unimpressive eight (8) wins and twenty-eight (28) losses before he was fired mid-season. He was hired by the New Orleans Saints the following year as a Defensive Coordinator (2015). When a Head Coaching Job opened with the New Orleans Saints in 2022, Dennis Allen applied and interviewed along with four (4) African American Assistant Coaches (Aaron Glenn, Brian Flores, Byron Leftwich and Eric Bieniemy). Out of Dennis Allen and

the African American candidates that interviewed for the job, only three (3) had been a part of teams that went to the Superbowl on multiple occasions (Brian Flores, Eric Bieniemy and Byron Leftwich). Despite actual knowledge by the Saints organization that Dennis Allen experience as a Head Coach in the National Football League was 8 wins and 28 losses; he was chosen for the job over the African-American qualified candidates. While occupying the job as Head Coach for the New Orleans Saints from 2022-2024, Dennis Allen record was eighteen (18) wins and twenty-five (25) losses before he was once again fired mid-season. He is famously known for asking reporters the question on National Television during a live interview "what is a metaphor?"

42) From 2018-2022, Eric Bienemy (African-American) was employed by the Kansas City Chiefs as an Assistant Coach. He held the title of the team's Offensive Coordinator.  As the Chiefs Offensive Coordinator, Bienemy coached the Chiefs offense to win two Super bowls (2019,2022). From 2019 to 2024, Bienemy has interviewed for a vacant Head Coaching position on NFL Teams approximately fifteen (15) times and he has never been given an opportunity to be hired as a Head Coach. On February 18th 2023, Bienemy was hired by the Washington Commanders as their assistant Head Coach and Offensive Coordinator. When the Commanders made the decision to fire their Head Coach (Ron Rivera) in 2024, Bienemy interviewed for the vacant Head Coach position. The Commanders decided not to give Bienemy an opportunity as their Head Coach and hired Dan Quinn (white male) instead.

Dan Quinn previous Head Coaching experience was with the Atlanta Falcons. He had not been a Head Coach for an NFL Team for four (4) years prior to being hired by the Commanders. He was fired mid-season by the Falcons in 2020 after a zero (0) wins and five (5) loss record.  In the Falcons 2019 season, Dan Quinn coached the team to a seven (7) win and nine (9) loss season. When Dan Quinn was given the Head Coaching position by the Commanders who has never had an African-American Head Coach, Eric Bienemy was fired. Dan Quinn overall regular season Head Coaching record prior to being hired by the Commanders was an unimpressive forty-three (43) wins and (42) forty-two losses.

43) An NFL Team typically hires anywhere from twenty (21) to twenty-five (25) individuals to their Coaching Staff. With there being thirty-two NFL teams, the number of coaching staff employees going into an NFL season more than likely exceeds 700 employees. It is estimated that approximately 80% of coaching staff employees on NFL Teams are White Males.

44) The NFL is perceived to promote the White Supremacy ideology that White men must lead and everyone must follow through its discriminatory hiring practices in front of a world stage.

## DISCRIMINATION IN NFL PERSONAL CONDUCT POLICY

45) paragraphs 1-44 are incorporated by reference.

46) Deshaun Watson who is an African-American Quarterback in the National Football League was accused by dozens of women of sexual assault and inappropriate conduct during massage sessions by independent massage therapists.  While being the designated starter for the Houston Texans, the alleged pattern of predatory behavior that Watson was accused of allegedly happened between 2020 and 2021. Coincidentally, in 2021 and prior to the allegations against Watson being made public, he requested that the Houston Texans trade him to another team for what he perceived as a lack of respect by the Texans Owner, Cal McNair. He then sat out the entire 2021 season in protest and was traded to the Clevland Browns in 2022. It is widely believed that the Texans conspired to "publicly lynch" Deshaun Watson's character, reputation and image by releasing his alleged misogynistic pattern of behavior because he no longer wanted to play for the team. Two separate Grand Juries in Texas declined to indict Watson on criminal charges related to the allegations after reviewing all of the evidence. Under the NFL Personal Conduct Policy, an arbitrator designated by the NFL recommended that Watson be suspended for six (6) games for his alleged misconduct. However, the NFL led by Commissioner Roger Goodell appealed the recommendation in an effort to levy a more severe punishment against Deshaun Watson. Ultimately, the NFL Player Association representing Deshaun Watson entered into an agreement for Watson to serve an eleven (11) game suspension, pay a five (5) million dollar fine and undergo mandatory counseling. The fine levied against Watson is the largest fine ever

levied against an NFL Player.

47) Robert Kraft is a white male owner of the New England Patriots. It is important for the Plaintiff to state that Owners of NFL Teams are subject to discipline for misconduct under the NFL Personal Conduct Policy as well. In 2019, Robert Kraft was charged with two (2) counts of misdemeanor solicitation of prostitution following a human trafficking investigation into massage parlors in Florida. It is widely known that law enforcement had video evidence of Robert Kraft participating in unlawful conduct. The Court in the criminal case "suppressed" the video evidence of Mr. Kraft engaging in the exploitation of trafficked women due to a procedural error in which law enforcement videoed "other" people that did not participate in any crime which violated their fourth amendment rights.  Despite NFL's Commissioner Roger Goodell awareness of video evidence displaying Robert Kraft engaging in unlawful conduct as it pertains to exploited women for his personal pleasure, it is widely known that Mr. Kraft did not face any discipline under the NFL' Personal Conduct Policy.  The Plaintiff is perplexed as to why Roger Goodell and the NFL think they can operate with impunity of their discriminatory practices and disproportionate discipline against African Americans employed by the NFL. It is reasonable to believe that an Owner of an NFL team should be held to a higher standard regarding the NFL Personal Conduct Policy.

48) Jamies Winston who is an African-American Quarterback in the NFL received

a three (3) game suspension from the NFL in 2018 for violating the league's Personal Conduct Policy, stemming from a 2016 incident where he was accused of inappropriately touching an Uber female driver. The NFL's suspension of Jameis Winston required him to obtain a clinical evaluation and fully cooperate with any recommended therapeutic intervention.

49) In 2009, Ben Roethlisberger who is a white male and was an NFL Quarterback for the Pittsburgh Steelers was accused of the heinous crime of raping a female at a hotel in Nevada. In 2007 and two years prior to Rothlisberger being accused of sexual assault, Roger Goodell introduced a "new" NFL Personal Conduct Policy to "help control on and off-field behavior by its players and preserve the league's public interest". However, Roger Goodell representing the NFL as its commissioner chose not to subject Rothlisberger to any discipline regarding the sexual assault allegations that allegedly occurred in 2008. Rothlisberger denied the allegations in a civil suit filed by the alleged victim which was eventually settled out of court in 2012.

In 2010, Rothlisberger was once again accused of sexual assault by a college student in Georgia. The college student told police that Rothlisberger sexually assaulted her in a night club bathroom, while her friends said that they were blocked from reaching her by two off-duty Pennsylvania police officers who had accompanied Rothlisberger that night. After a second allegation of sexual assault by two different women, Roger Goodell representing the NFL as Commissioner levied a four (4) game suspension against Rothlisberger under the NFL Personal

Conduct Policy. The suspension of Rothlisberger (four games) after two sexual assault allegations are the same punishment NFL Players receive for getting caught smoking marijuana one time and just one game more than James Winston received for inappropriate touching.

50) In 2009, Dante Stallworth was suspended indefinitely for the 2009 season by the NFL's Commissioner Roger Goodell after being charged with DUI manslaughter.  Roger Goodell stated "Stallworth's actions undermined the integrity of the league".  Stallworth's blood alcohol level after the fatal car crash was allegedly .126 which was well above Florida's legal limit of .08 at the time. The extenuating circumstance of the fatal accident is that the pedestrian that Stallworth struck was walking across a causeway while not being in the safety of a crosswalk. Stallworth's NFL suspension costed him approximately 750,000 in loss earnings through the 2009 season.

51) Jim Irsay was the owner of the Indianapolis Colts until his recent death in May 2025. In March 2014, Irsay was arrested on preliminary charges of driving under the influence (DUI) and possession of controlled substances. A toxicology test showed oxycodone, hydrocodone, and alprazolam were in his system at the time he was pulled over while driving. Officers found various prescription drugs in his vehicle. In 2014, Irsay pleaded guilty to a single misdemeanor count of operating a vehicle while being intoxicated and received a one-year probation period. Commissioner Roger Goodell suspended Irsay for six (6) games and fined

him 500,000 dollars. The suspension that Roger Goodell levied to Irsay is perceived to be equivalent to a parent telling a child "Go to your room".  Irsay was a billionaire who owned an NFL team and watched games from his luxury box. It is reasonable to believe that if Irsay was put in the same or similar situation as Stallworth that Irsay would have struck the pedestrian as well due to be intoxicated.  Stallworth was suspended the entire season of work and lost his salary of approximately 750,000 while Irsay (billionaire) was suspended from his luxury suite and fined 500,000. Irsay later claimed that he was "prejudiced against" because he was a "rich, white billionaire". Irsay family has admitted that Irsay's struggle with drug addiction was well documented with instances of multiple "overdoses". It is reasonable to believe that the NFL and Roger Goodell was aware of Irsay's multiple overdoses and addictions and chose not to discipline him under the NFL Personal Conduct Policy as it has done with a multitude of African-American NFL players.

52) In 2021, Britt Reid who is a white male, was employed by the Kansas City Chiefs as an Assistant Coach. While working at the team's facility, he became intoxicated. It is unclear if Reid was provided the Alcohol by someone within the Chiefs' organization or if he obtained the alcohol and brought it to the facility but the facts indicate that he consumed alcohol and he was intoxicated prior to leaving the Chiefs facility and before he entered his vehicle to attempt a half hour commute to home. He didn't make it a mile before slamming his pick-up truck, traveling 84 miles an hour into two parked cars. Britt Reid injured six

individuals including himself.

As a result of Reid's decision to drive while being intoxicated, four people were initially hospitalized in serious condition, including a 4-year-old girl. The fifth victim was a 5 years old girl who Reid sent into an eleven (11) day coma. The NFL made a statement that it" would review Reid's conduct under its Personal Conduct Policy." However, there was never any disciplinary action made public by the NFL's Commissioner Roger Goodell against Britt Reid. Nor was there discipline action taken against anyone else in the Chiefs organization who was aware of Reid being intoxicated prior to leaving the facility and/or took part drinking alcohol on the job along with Reid or the Kansas City Chiefs Organization for allowing employees to consume Alcohol in a workplace environment which would have contributed to the injuries the victims sustain from Reid. There is extensive security and surveillance in all NFL buildings. If the NFL did conduct an investigation, Roger Goodell has never relayed its findings to the public. The Plaintiff can only assume that Roger Goodell's decision to remain silent on the issue of Britt Reid is to protect other individuals and/or the National Football League. Dante Stallworth received a one-year suspension while no one was ever disciplined when Britt Reid almost killed five (5) people including children while driving under the influence.

**GENERAL ALLEGATIONS**

53) paragraphs 1-52 are incorporated by reference.

54) The Plaintiff is mortified, traumatized and emotionally distressed by the National Football League's racially motivated treatment of African-American male athletes. The Plaintiff is an African-American male who has also experienced instances of racial bias which allows him the ability to empathize with other African-American men that experience racist behavior. The National Football League is uniquely situated as its workplace environment is on display for the entire world to see; similar to going to a drive-in movie. The systematic-racism against African-American men (in particularly the Head Coach and Quarterback) that has been embedded within the NFL for over a century is disgusting.

55) The National Football League has conspired and colluded for centuries to perpetuate a Racial Monopoly at the Head Coaching and Quarterback Position on NFL Teams.

56) Troy Vincent, a Black, Hall of Fame former cornerback, and current NFL Executive Vice President of Football Operations, recently stated with regard to the treatment of Black Head Coaches in the NFL: "There is a double standard, and we've seen that . . . And you talk about the appetite for what's acceptable. Let's just go back to . . . Coach Dungy was let go in Tampa Bay after a winning season. . . Coach Wilks, just a few years prior, was let go after one year . . . Coach

Caldwell was fired after a winning season in Detroit . . . It is part of the larger challenges that we have. But when you just look over time, it's over-indexing for men of color. These men have been fired after a winning season. How do you explain that? There is a double standard. I don't think that that is something that we should shy away from. But that is all part of some of the things that we need to fix in the system. We want to hold everyone to why does one, let's say, get the benefit of the doubt to be able to build or take bumps and bruises in this process of getting a franchise turned around when others are not afforded that latitude? . . . We've seen that in history at the [professional] level."

57) Plaintiff has watched while Defendant collaborates and colludes to discriminately monopolize the Head Coaching position and Quarterback position on NFL teams with disproportionate hirings of White Males.

58) Plaintiff has watched while Defendant has disproportionately and discriminately retaliated against African-American players employed by the NFL for excursing their constitutional rights.

59) Plaintiff has watched while Defendant has disproportionately levied more severe punishment under its Personal Conduct Policy against African American players employed by the NFL.

60) Plaintiff has watched while Defendant has colluded to negatively impact the

careers, image, financial status and character of African-American players in a disproportionate way as oppose to White Male NFL Players and Coaches.

61) Plaintiff has watched while Defendant has developed and continues to develop a systematic discriminatory policy against African Americans being in leadership positions while employed by NFL Teams.

62) Plaintiff has watched while Defendant discriminates against African American males in player development opportunities at the Quarterback position.

63) Plaintiff has watched while Defendant displays racial bias in its Personal Conduct Policy to favor white male coaches and NFL Owners.

64) Plaintiff has watched while Defendant colludes and violates Anti-Trust laws by hindering African-American Men in their ability to learn, develop and compete on NFL Practice Squads for NFL Quarterback positions.

65) Plaintiff has watched while Defendant has displayed a willingness to lose games consistently rather than replace White Male starting Quarterbacks with African American Quarterbacks who have shown an ability to consistently win and compete for a championship in violation of Anti-Trust Laws.

66) Plaintiff has watched the Defendant violate the District of Columbia Human Rights Act both past and present day in its discriminatory practices against African-American players and coaches.

## FIRST CAUSE OF ACTION

## (VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT)

67) Paragraphs 1-66 are incorporated by reference.

68) The District of Columbia Human Rights Act prohibits discrimination in employment. There can be no dispute that the National Football League is "rife with racism". The systemic-racism against African-American football players employed by the NFL has lasted a century. This Honorable Court need only review what African-American players themselves are saying, what African-American Coaches are saying and what the public is saying to conclude that there is a consistent racial bias against African-Americans by NFL Teams. By watching the discriminatory behavior and practices unfold in the National Football League workplace against African-Americans, it has caused the Plaintiff anxiety, depression, emotional distress, trauma, and hypertension. Under the D.C. Human Rights Act, the Plaintiff is allowed to bring this action for witnessing the discriminatory practices and behavior directed towards African-Americans employed by the National Football League. The Plaintiff is aggrieved by the actions of the Defendant and seeks damages.

## SECOND CAUSE OF ACTION

## VIOLATION OF D.C. CODE 22-3704

## (INTENTIONAL EMOTIONAL DISTRESS RESULTING FROM RACIAL TRAUMA)

69) paragraphs 1-68 are incorporated by reference

70) The NFL has operated for over a century and has been unapologetic with its racial norms and discriminatory practices against African-Americans. The emotional distress and trauma that the Plaintiff has experienced while watching the NFL discriminatory practices against African-American men such as himself is unquantifiable.  The Plaintiff should be awarded damages against an NFL Organization that has been and continues to be "rife with racism" ever since its creation.

It is now clear that racial trauma stems from both explicit and implicit acts of racism and that the injuries are both severe and long lasting. The injuries result from egregious acts like extrajudicial police killings – which affect both the victim and immediate family – as well as more commonplace acts which are often equally as damaging. The symptoms of traumatic injury can be severe and include flashbacks, loss of memory and concentration, depression, irritability, and substance abuse (Mansoor 2020). In addition, racist incidents also produce feelings of powerlessness and betrayal in a way that closely parallels the

experience of victims of childhood sexual abuse and sexual assault (Mansoor 2020: 894).

Racialized social experiences – often due to institutional anti-Blackness – can produce chronic health impacts (Dressler et al. 2005). For example, evidence shows that at specific ages, Black people are approximately three biological years older than white people (Levine and Crimmins 2014: 27). That is, their bodies have been aged due to stress and racism. And these exposures to stress factors create chronic trauma.

Studies from Holocaust survivors, whose trauma experiences are similar, found that the severity of posttraumatic stress disorder (PTSD) is dependent on both cumulative and recent stress exposure (Yehuda et al. 1995). Importantly however, psychological responses to trauma vary significantly (Yehuda et al. 1995). In particular, some people show resilience to extreme stress (van IJzendoorn et al. 2003). Holocaust survivors were found to have "heightened sensitivity of the neuroendocrine stress response, including low urinary cortisol excretion...and increased glucocorticoid receptor responsiveness" (Lehrner and Yehuda 2018: 1765). The age of exposure to psychological trauma has also been shown to change the biological impact (Lehrner and Yehuda 2018). Early age exposure to trauma has been found to affect the total glucocorticoid production rate (Yehuda et al. 2009), mental health outcomes, and the hypothalamic–pituitary–adrenal (HPA) axis (Walters et al. 2011). Even the earliest studies of those who experienced trauma suggests strong biological ramifications. Emerging research now shows that the experience of trauma extends to acts of

racism. And these acts of racial violence have strong biological implications that are closely aligned with environmental conditions. For example, Kuzawa and Sweet (2009: 2) identified that racism in combination with environmental exposures explains cardiovascular disparities between Black and white American populations. Indeed, exposure to chronic racism often explains severe injuries at the individual level, as well as disparate health outcomes at the structural level.

Epigenetics research shows us how biological changes from traumatic injury can be transferred to future generations. Transfer of trauma can occur culturally (see e.g., Eyerman 2001; DeGruy 2017; Walters et al. 2011) as well as biologically such as through gametic and intrauterine pathways (Lehrner and Yehuda 2018). In simple terms, epigenetics can be described as "the means by which the environment 'turns genes on or off'" (Lehrner and Yehuda: 1768). Epigenetic research expands the demonstration of injuries stemming from racial trauma, by showing that they can be passed onto future generations.

Epigenetics show us that trauma is supported by a wealth of biological research. On the other hand, mapping of the human genome suggests that there is no genetic variation responsible for the characteristics described as race (Grave 2018). Indeed, the very idea of race as we perceive it has "untenable biological foundations" (Suzuki and von Vacano 2018: 3) and is mostly assumed to be a sociopolitical construct (Obasogie et al. 2017). Yet, race is still used systematically in the law, throughout socio-political structures, and is used routinely in medical treatment. And in the context of trauma, is still used as a

marker of animus which can determine violence and injury. This means that racism is experienced at a group level and has cultural implications. Trauma can thus, be experienced culturally (Alexander at al. 2004). DeGruy (2017) conceptualizes cultural trauma from slavery as "Post Traumatic Slave Syndrome". This encapsulates the legacy of Jim Crow, redlining, white capping, systemic bias, lack of access to loans, lack of property assets, and the vicious cycle that ensues. Exposure to these traumatic experiences can lead to what were once effective coping mechanisms for trauma being passed down generations.

The scientific evidence reviewed above strongly suggests that racial animus and racism can cause serious physical injury. More so, that these injuries can impact future generations. Thus, new science and epigenetic evidence can help show the sorts of causal links necessary to establish tort liability. (They can do so within a framework of policy arguments about racial harm.)

This evidence also goes to other aspects of tort law. For instance, it can shape our understanding of foreseeability. Courts such as Palsgraf have ruled that some kinds of unexpected harms do not give rise to tort liability, due to lack of foreseeability. However, the recent studies provide a basis for showing that racial trauma is indeed foreseeable. An injury motivated by racial animus – for example, a racial slur – would likely in itself demonstrate that the tortfeasor's action was motivated by racial animus. A defendant cannot claim not to have foreseen injury where the defendant has acted with racial animus and caused traumatic injury because of racial prejudice. Another element in litigating racial injury in tort law is the element of damages. As scholars have noted (e.g.

Chamallas 2020), tort law has not historically been receptive to emotional or dignity harms – Chamallas characterizes tort law as "a flawed system that tends to reproduce rather than ameliorate racialized harms."

The epidemiological evidence suggests that racial acts both individually and institutionally can cause severe physical injuries. The scientific mechanisms help to connect how physical injury can be connected to a tortfeasor, and the epigenetic mechanisms show that these injuries not only affect the individual but can also be passed down to future generations.

If the narrative is shifted from victimization to accountability – especially in instances of racial trauma where the injury is precedential (Perry 2009) – tort law can act to validate a plaintiff's sense of injustice and can empower on a societal level (Solomon 2009).

Damages are social in nature. While offering significant potential benefits, they are also affected by the same racial biases that exist everywhere. By measuring injuries and awarding damages, courts assign a social value to a plaintiff's injuries (Chamallas and Wriggins 2010: 156). This may be especially the case with punitive damages, where courts examine the nature of a perceived wrong in assessing how much to punish a bad actor. Both compensatory and punitive damages can reflect racial biases. Chamallas (2020) notes that courts could take into account how racial creates "recurring, cumulative" harms. Many courts use actuarial tables in calculating damages. However, Chamallas and Wriggins (2010: 150) show that race- and gender-based data tables result in considerably lower awards for minorities and can perpetuate systemic biases. As Chamallas notes

(2020), these tables "bake in the discriminatory practices of the past." For that reason, Chamallas and Wriggins suggest that courts follow in the footsteps of a minority of courts who have imported Title VII concepts to calculate recovery (Chamallas and Wriggins 2010: 188). Using Title VII concepts here means applying Equal Protection arguments to recovery calculations and therefore disregarding the gendered and racialized bias present in many statistical tables. Noneconomic damages can also be a site which is affected by racial biases.

### THIRD CAUSE OF ACTION
### (VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT 1964)

71) Paragraphs 1-70 are incorporated by reference

72) The National Football League has historically discriminated against African-Americans. Their discriminatory practices against African-Americans span over a century and includes present day (2025). The Defendant has subjected African-Americans based on race to disparate terms and conditions of employment, including but not limited to, lack of opportunity and harm to professional reputation and has subjected African-Americans to unequal compensation relative to their white peers.

73) The Defendant have fostered, condoned, accepted, ratified and/or otherwise failed to prevent or remedy discriminatory conduct due to race

and/or color. Defendant is comprised of thirty-two (32) professional football teams that have actually colluded, participated in and aided and abetted the discriminatory conduct of the Defendant.

74) The Plaintiff is entitled to damages due to decades of witnessing the Defendant intentional unlawful discriminatory practices against African-Americans which have exasperated his own experiences of racial slurs and racial injustice causing Post Traumatic Stress Disorder, Emotional Distress, Depression, Humiliation, Hypertension, and Aggravation.

## FOURTH CAUSE OF ACTION
## (VIOLATION OF D.C. CODE 28-4508)

75) Paragraphs 1-74 are incorporated by reference.

76. Racial Discrimination is prohibited in a business according to District of Columbia Law.

77) The National Football League is a business that sells goods and advertises in the District of Columbia. There is an NFL team (the Washington Commanders) the represent the District of Columbia.

78) As previously stated, the Plaintiff has been injured by the actions of the

Defendant and brings this action seeking punitive damages, general damages, compensatory damages, statutory damages, injunctive relief and equitable relief.

## FIFTH CAUSE OF ACTION
## (GROSS NEGLIGENCE)

79) paragraphs 1-78 are incorporated by reference.

80) The Defendant has shown a willful intent to injure the Plaintiff and all African Americans in front of a world audience by the use of its discriminatory practices against a protected class in particularly, African-Americans.

81) Throughout the history of the NFL organization, it has shown a willful disregard for the rights of its African-American players on the bases of color which reflects its disregard for the rights of all African-Americans.

82) The Defendant has displayed for over a century a severe departure from the ordinary standard of care mandated by both State and Federal Laws pertaining to a protected class.

83) The Defendant has shown a conscious indifference by admitting being aware of the systematic-racism against African-Americans by NFL teams and not preventing such behavior from re-occurring which continues to injure the

Plaintiff.

## SIXTH CAUSE OF ACTION

## (VIOLATION OF THE SHERMAN ACT 1890)

84) Paragraphs 1-83 are incorporated by reference.

85) NFL Fans are consumers that support the National Football League monetarily. Fans exhibit joy when their favorite NFL teams win games and emotional distress when their favorite team lose. The NFL is mandated by Anti-Trust Laws (The Sherman Act of 1890) to prohibit collusion and intentional attempts by NFL Teams to monopolize the Quarterback and Head Coaching positions with White Males. Even though there has been more African-Americans allowed to hold "starting quarterback" positions in recent years, the NFL has shown through the huge disparity in its hiring of "Back-up Quarterbacks" and "Practice Squad Quarterbacks" its intention to develop White Male Quarterbacks at an alarming rate as oppose to displaying any interest in the development of African-American Quarterbacks which constitutes an anti-competitive business practice. As previously stated, of the twenty-eight NFL Teams that hired a Practice Squad Quarterback in 2025, twenty-three are White Males, four are Black Males, with one Latino. The NFL has colluded and conspired for over a century to keep White Men in

leadership positions on NFL Teams at the expense of stifling the competitive nature of the sport.   Moreover, NFL Teams "re-cycle bin" of hiring White Male Coaches and White Male Quarterbacks that have failed to show a track record of meeting the expectations of NFL Fans by not showing an ability of competitiveness while hindering those same opportunities for qualified African-American Coaches and Quarterbacks is an anti-competitive business practice and violates the Sherman Act.

86) Defendant is comprised of a Racial Monopoly of white male team owners that have all decision-making powers and influence over team operations and they have abused their power for over a century through systemic-racism and economic policies that disadvantage African-American males as it pertains to the Head Coach and Quarterback position on NFL Teams and racial bias in their Personal Conduct Policy; their Racial Monopoly has continued to have a negative impact on the sport. The historical collusion to maintain discriminatory practices by the Defendant against African-Americans due to their Racial Monopoly violates the Sherman Act.

87) The Defendant conspires and colludes to restrict competition in Interstate Commerce by refusing to allow fair opportunity to African-American Coaches and Quarterbacks.

88) The Plaintiff reiterates his injuries of hypertension, anxiety, emotional distress, aggravation, depression, post traumatic distress and humiliation due to previous statements made in conjunction with the Defendants violations of the Sherman Act of 1890.

## SEVENTH CAUSE OF ACTION
### (VIOLATION OF THE CLAYTON ACT)

89) Paragraphs 1-88 are incorporated by reference.

90) The Defendant conspires and colludes to restrict competition in Interstate Commerce by refusing to allow fair opportunity to African-American Coaches and Quarterbacks.

91) The Defendant has conspired and colluded to support White Male Dominance at the Quarterback and Head Coach position which has negatively impacted the competitive nature of the sport.

92) Defendant is comprised of a Racial Monopoly of white male team owners that have all decision-making powers and influence over team operations and they have abused their power for over a century through systemic-racism and economic policies that disadvantage African-American males as it pertains to the Head Coach and Quarterback position on NFL Teams and racial bias in their

Personal Conduct Policy; their Racial Monopoly has continued to have a negative impact on the sport. The historical collusion to maintain discriminatory practices by the Defendant against African-Americans due to their Racial Monopoly violates the Clayton Act.

93) The Plaintiff reiterates his injuries of hypertension, anxiety, emotional distress, aggravation, depression, post traumatic distress and humiliation due to previous statements made in conjunction with the Defendants violations of the Clayton Act.

## EIGHTH CAUSE OF ACTION

## (VIOLATION DISTRICT OF COLUMBIA CONSUMER PROTECTION ACT)

94) Paragraphs 1-93 are incorporated by reference.

95) Under the DCCPA Code 2-1402.11 (Prohibitions) it states: It shall be an unlawful discriminatory practice to do any of the following acts, wholly or partially for a discriminatory reason based upon the actual or perceived: race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, gender identity or expression, family responsibilities, genetic information, disability, matriculation, political affiliation, status as a victim or family member of a victim of domestic violence, a sexual offense, or stalking, credit information, or homeless status of any individual:

**(1)(A) By an employer. —** To fail or refuse to hire, or to discharge, any individual; or otherwise, to discriminate against any individual, with respect to his or hers compensation, terms, conditions, or privileges of employment, including promotion; or to limit, segregate, or classify his or hers employees in any way which would deprive or tend to deprive any individual of employment opportunities, or otherwise adversely affect his or hers status as an employee;

96) The National Football League is a business that conducts business in the District of Columbia. Therefore, the business is subject to District of Columbia Laws.

97) The Defendant has discriminated against African American Coaches in its hiring and firing process for over a century. A Coaching staff on an NFL Team is comprised of approximately twenty-two (22) to twenty-five (25) coaches.

98) The Defendant has discriminated against African-American athletes at the Quarterback position.

99) The Defendant has discriminately applied its Personal Conduct Policy when applied to African-American players.

100) African-American "Back-up" Quarterbacks are forced to accept less pay then their White Male Counterparts.

101) The Defendants willfully and intentional discriminates in its hiring process of Practice Squad Quarterbacks.

102) Defendant has consistently and historically favored White Male Quarterbacks over Black Male Quarterbacks in their Quarterback development process.

103) The Plaintiff reiterates his injuries of hypertension, anxiety, emotional distress, aggravation, depression, post traumatic distress and humiliation due to previous statements made in conjunction with the Defendants violations of the District of Columbia Consumer Protection Act.

## NINTH CAUSE OF ACTION
## (GENERAL DAMAGES)

104) Paragraphs 1-103 are incorporated by reference.

105) Due to the many violations of Federal Laws, D.C. Civil Codes and Torts by the Defendant and the Defendants' willful, intentional and historical discriminatory practices against African-Americans (in front of a world-stage) who make up approximately 70% of NFL Players, the Plaintiff seeks General Damages against the above-named Defendant for his injuries of hypertension,

anxiety, emotional distress, aggravation, depression, post traumatic distress and humiliation.

106) The Defendant's collective wrongful acts should be deterred by an award of General Damages.

## TENTH CAUSE OF ACTION
## (PUNITIVE DAMAGES)

107) Paragraphs 1-106 are incorporated by reference.

108)  Due to the many violations of Federal Laws, D.C. Civil Codes and Torts by the Defendant and the Defendants' willful, intentional and historical discriminatory practices against African-Americans (in front of a world-stage) who make up approximately 70% of NFL Players, the Plaintiff seeks Punitive Damages against the above-named Defendant for his injuries of hypertension, anxiety, emotional distress, aggravation, depression, post traumatic distress and humiliation.

109) The Defendant's collective wrongful acts should be deterred by an award of Punitive Damages.

## ELEVENTH CAUSE OF ACTION

**(AN AWARD OF ATTORNEY FEES)**

110) Paragraphs 1-109 are incorporated by reference.

111) The plaintiff reserves the right to seek representation by the hire of an attorney

**DECLARATORY JUDGEMENT AGAINST THE NATIONAL FOOTBALL LEAGUE**

112) Paragraphs 1-111 are incorporated by reference.

113) Defendant National Football League which is collectively compromised of thirty-two NFL Teams (each of them) actions in historically colluding to monopolize the Head Coaching and Quarterback positions on teams with White Males were careless and in violation of Federal Laws and District of Columbia Laws.

114) Defendant National Football League has historically violated and continues to violate Anti-Trust Laws.

115) Defendant National Football League has violated the District of Columbia Human Rights Act, The Sherman Act of 1890, The Clayton Act, Title VII of the Civil Rights Act 1964, The District of Columbia Consumer Protection Act, D.C. Code 28-

4508, and D.C. Code 22-3704.

116) Defendant National Football League (collectively) acted will willful and malicious intent to harm the Plaintiff.

## PERMANENT INJUNCTION-SPECIFIC PERFORMANCE AGAINST THE NATIONAL FOOTBALL LEAGUE

117) Paragraphs 1-116 are incorporated by reference.

118) Plaintiff seeks to enjoin the National Football League as follows:

a. Order that the thirty-two NFL Teams that collectively create the National Football League and its Racial Monopoly of White Male Owners with all decision making power and authorities regarding team operations which has perpetuated systemic racial policies and procedures against African-Americans which has also negatively impacted fair competition is in violation of Anti-Trust Laws.

b. Order Defendant National Football League to cease all anti-black and discriminatory practices against African-Americans in general but in particular at the Head Coaching Position and Quarterback Position.

c. Order Defendant National Football League to pay Statutory and Compensatory

damages to the Plaintiff for violations of the D.C. Human Rights Act, their anti-black and discriminatory practices against African Americans, their unlawful and historical acts of systemic-racism against African-Americans, perpetuating a racial-monopoly and for violating Anti-Trust Laws in the amount of fifty-million (50,000,000) dollars.

## PRAYER FOR RELIEF

119) Paragraphs 1-118 are incorporated by reference

120) Wherefore Plaintiff John Doe asks for relief as follows:

a. Order Defendant National Football League to pay General Damages to the Plaintiff for their wrongful, unlawful and historical acts of systemic-racism against African-Americans, perpetuating a racial-monopoly and for violating Anti-Trust Laws in the amount of one-hundred million (100,000,000) dollars.

b. Order Defendant National Football League to pay Punitive Damages to the Plaintiff for their wrongful, unlawful and historical acts of systemic-racism against African-Americans, perpetuating a racial-monopoly and for violating Anti-Trust Laws in the amount of five-hundred (500,000,000) million dollars.

## CONCLUSION

121) Paragraphs 1-121 are incorporated by reference.

122) The Defendants deliberate and malicious attempts to violate State and Federal Laws to achieve their goal of creating and operating systemic-racist policies and procedures against African-Americans should be appalling to this Court. The Defendant operates in front of a world-stage with reckless disregard for the human dignity of its African-American athletes. The Defendant sit in their luxury suites like white slave owners as they watch African-American men put their lives on the line to make them wealthier while continuing to deny them fair opportunities. The Plaintiff is aggrieved by the century old systemic-racism against African-Americans by the National Football League. The Plaintiff authored a book and self-published it on Amazon last year directing attention to these very same issues of systemic-racism as a therapeutic coping mechanism. The Plaintiff humbly requests that this Court hold the Defendants accountable for their unlawful acts and unfair business practices.  Here are recent statements from NFL Players interviewed by ESPN regarding systemic-racism in the NFL in 2025:

A) Anthony Walker Jr (Miami Dolphins) "Until you see more coaches, were all going to look at it the same way; there aren't enough Black Coaches".
B) Terry McLaurin (Washington Commanders) " You cant just overlook that discrepancy. Obviously, you want the best candidate for the job whether it is

someone who is Black, White, Asian of whoever. However, when you have a big representation of African American players that are in your league, you would like to see that represented in coaching as well".

123) Out of thirty-two (32) NFL Teams that create the National Football League, eleven (11) teams have never had and African American Head Coach.

124) From 2000 through the end of the 2024 NFL season and of the twenty-one NFL Teams that have employed an African American Head Coach, eight (8) African American coaches were fired after only one full season, which is 42% of the 19 total first-year head coaches fired during that period.

> I, John Doe, am the Plaintiff in the above entitled-action. I have read the foregoing Complaint and know the contents thereof. The same is true of my own knowledge, except as to those matters which is therein alleged on information and belief, and as to those matters, I believe it to be true. I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed this 10th day of September 2025, in the District of Columbia.

> John Doe